IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RAYNARD R. JACKSON,

                Plaintiff,                OPINION AND ORDER

v.

                                              18-cv-237-wmc

DANE ESSER, DARYL FLANNERY
and BETH EDGE,

                Defendants.

---

Plaintiff Raynard Jackson, who is now represented by counsel, is proceeding in this lawsuit against three employees of the Wisconsin Department of Corrections ("DOC") working at its Secure Program Facility ("WSPF") in 2013. Specifically, Jackson is proceeding against defendants Dane Esser, Daryl Flannery and Beth Edge on Eighth Amendment claims arising out of the conditions of his confinement at WSPF between May 22 and 28, 2013. Currently before the court is defendants' motion for partial summary judgment. (Dkt. #111.) Defendants seek summary judgment as to Jackson's Eighth Amendment claims against Flannery and Edge, for failing to treat Jackson for dehydration on May 27. They do not seek summary judgment on Jackson's claim against Esser. Because no reasonable factfinder could conclude that Flannery or Edge consciously disregarded Jackson's health or safety, defendants are entitled to summary judgment as to Jackson's claims against them. Therefore, the court will grant defendants' motion, and Flannery and Edge will be dismissed from this case.

UNDISPUTED FACTS[1]

Raynard Jackson was incarcerated at WSPF in 2013. At that time, defendant Daryl Flannery was working at WSPF as a Captain, and defendant Beth Edge was working as nurse clinician in the Health Services Unit ("HSU"). Defendant Lieutenant Dane Esser was an officer working at WSPF.

From May 22 to May 27, 2013, Jackson was held in a clinical observation cell that did not have running water. Some five days before Jackson was placed there, the water had been turned off in that cell because staff had to remove an inmate with force. However, because staff did not turn the water back on after that removal, when Jackson was placed in that on May 22nd, he had no access to running water. Jackson claims that from May 22 to May 27, he told multiple WSPF officials that he did not have running water, but to no avail, causing him to suffer extremely uncomfortable symptoms associated with dehydration.

Nurse Edge attests that on May 23 and 24 or 2013, she had checked on Jackson during rounds. On May 23, Edge's notes reflect that Jackson was standing at the front of his cell, and on May 24 at about 2:30 p.m., Jackson had asked her about nasal spray and was speaking to her through a vent. Jackson claims that he told Edge that he did not have water during each of those visits, while Edge attests that Jackson did not say that his water was cut off or that he was dehydrated. Edge further attests that Jackson presented with no

---

[1] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying, record evidence as appropriate.

symptoms of dehydration, while Jackson says that he told Edge that he was suffering from dehydration. During similar rounds on May 23 and 24, other staff noted that Jackson was asleep, or awake and eating, but there was no note that Jackson complained that he was dehydrated because he did not have access to water. Jackson also claims that he did not eat anything on either day.

According to Jackson, he also showed Edge on May 27 that he had no running water in his cell, and Edge responded by screaming at Esser to turn the water back on, which Jackson attributes to Edge's effort to cover up her own failure to provide him medical attention.[2] Regardless, Esser turned the water back on May 27th.[3] According to Edge, she also attempted to examine Jackson at that time, but when she tried to provide him medical attention at his cell door, Jackson stated, "I ain't had H20 in this cell all week, what are you going to do about it?" (Edge Decl. (dkt. #114) ¶ 12; Ex. 1012 (dkt. #116-1) 3-4.)

Edge further attests that she asked Jackson to come out of his cell for a physical assessment because he had complained of chest pains, but he responded: "Bitch, I asked you a question. What the fuck you going to do about my H2O?" (Edge Decl. (dkt. #114) ¶ 13; Ex. 1012 (dkt. #116-1) 3-4.) Edge attests that because of Jackson's argumentative

---

[2] The court granted Jackson leave to proceed against Edge only on the claim that she failed to provide Jackson needed medical care on May 27. Nor has Jackson requested leave to amend his complaint to broaden his claim against Edge. As a result, the court is not inclined to grant a request to broaden Jackson's claims against Edge at this late stage of the lawsuit.

[3] Jackson maintains that he had told Esser multiple times before May 27 that he had no running water. While the dispute is genuine and material to Jackson's claim against Esser, it is not material to the pending motion.

3

response and refusal to come out of his cell, she considered Jackson's behavior to be a refusal of care. Edge explains that HSU staff are not allowed to treat inmates who refuse medical care unless they lose consciousness. To this, Jackson denies that he refused treatment and that Esser told Edge that Jackson refused to leave his cell, although he does not deny cursing Edge and refusing to leave his cell.

Regardless, after their exchange, Edge directed Jackson to submit a Health Services Request ("HSR") if his symptoms did not improve. Edge also states that: she did not observe any signs that Jackson was suffering from mild, moderate or severe hydration; she did not believe his condition to be urgent; nor did she refer him to an advanced care provider. Moreover, running water to Jackson's cell was restored that same day, at which point he could drink water again.

Still, Jackson maintains that he needed medical attention. He claims that during third shift on May 27, he complained to defendant Captain Flannery about chest and back pain from the lack of water. According to Jackson, Flannery responded that there was no nurse at that time of day, so he would be seen in the morning. Flannery does not recall this in-person interaction, but he believes Jackson likely told him during rounds in Jackson's unit. Flannery further maintains that if Jackson had reported severe chest pains to him, it would have been recorded in the unit logbook by the sergeant who was working that night. Flannery attests that because of the sergeant's May 27 note, he called the on-call nurse at 1:00 a.m. on May 28. Flannery reported to the nurse that Jackson complained he was dehydrated, while apparently omitting Jackson's report of chest pain.

The nurse then responded that Jackson did not need to be seen until the following

4

morning. Later, when Jackson filed an inmate complaint about Flannery's handling of his complaints, the nurse described her exchange with Flanner as follows:

> Received call from Cpt. Flannery about [Jackson]. Patient complained of being dehydrated. Has been yelling at staff. Cpt. Flannery stated he denies being on a hunger strike. Cpt. checked records and it shows patient eating/drinking. State his mouth and tongue felt dry/swollen. Cpt. Flannery saw no symptoms to contribute to complaints. Advised to rinse mouth and drink water. If no improvement, call RN back.

(*See* dkt. #43-4, at 12.) Accordingly, Jackson received no medical attention overnight from May 27th to May 28th.

On May 31, 2013, a doctor ordered a comprehensive metabolic panel and urine dip for Jackson, and a nurse met with him about those orders. Jackson complained to the nurse that he had been without water while in the observation cell and that his body was "shutting down." (*See* Ex. 1012 (dkt. #116-1) 5.) However, Jackson refused a physical assessment by the nurse; medical staff were unable to obtain a blood or urine sample; and Jackson was argumentative and angry.

Jackson purports to dispute this as well. Specifically, he testified at his deposition that he sought out medical treatment from the HSU, but Edge intercepted those requests and fabricated that he refused treatment. Even so, Jackson has submitted no evidence to support this fabrication claim, and Jackson's speculation on this point does not create a genuine issue of fact. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008)("It is well-settled that speculation may not be used to manufacture a genuine issue of fact."). In fairness, however, no HSU records show that Jackson received follow up care for

5

dehydration other than being provided fluids, which were made available to him starting May 27th.

Ultimately, Jackson claims that because he went without fluids for five consecutive days, he suffered psychological and physical pain and discomfort. He further claims that when he was finally able to start drinking water again on May 27, he had to painfully sip small amounts of water until the "swelling" caused by the dehydration subsided. As a result, Jackson claims he dealt with dehydration-like symptoms for weeks.

## OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Defendants seek summary judgment on the merits of plaintiff's Eighth Amendment claims against Edge and Flannery.

The Eighth Amendment gives prisoners the right to receive adequate medical care, *Estelle v. Gamble*, 429 U.S. 97 (1976). To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements: (1) an objectively serious medical condition; and (2) a state official who was deliberately indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). First, a medical need is "serious" if it: so obviously requires treatment that even a lay-

6

person could recognize the need for medical attention; carries risk of permanent serious impairment if left untreated; results in needless pain and suffering; *or* significantly affects an individual's daily activities. *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997). Second, "deliberate indifference" is a high standard, requiring proof that the official was aware a prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Thus, acts of deliberate indifference requires *more than* negligence or even gross negligence, but requires something *less than* purposeful acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

The threshold for deliberate indifference is met where: (1) "the official knows of and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it. *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance.").

Here, defendants Edge and Flannery seek summary judgment as to both elements. However, the court need not resolve the parties' dispute about whether Jackson was suffering from a serious medical need on May 27, because neither defendant's response to Jackson's claimed need for medical attention amounted to deliberate indifference.

I. **Nurse Edge**

Nurse Edge contends that she did not consciously disregard Jackson's need for medical attention on May 27 because he refused her attempt to examine him that day. Jackson's arguments in opposition are not grounded in the record. First, Jackson maintains that he told Edge on May 23 and 24 that he had no water, but the court granted Jackson leave to proceed against Edge with respect to their May 27th interaction only, and Jackson has not sought leave to amend his complaint to broaden this claim. Nor does Edge's earlier, alleged knowledge that Jackson lacked water in his cell impact her liability for their interactions on May 27. Indeed, there is <u>no</u> dispute that when Edge attempted to assess Jackson to address his reported chest pain on May 27, he was argumentative and refused to leave his cell. While Jackson insists that his behavior did not amount to a refusal of medical attention, and that Edge improperly tried to assess him for his complaints about chest pain, rather than his dehydration, he does <u>not</u> deny that Edge was attempting to address his chest pain complaints. Further, Nurse Edge attests that when inmates behave in an argumentative manner and refuse directives related to their medical care, HSU staff are not allowed to treat absent express consent. (Edge Decl. (dkt. #114) ¶¶ 14-15.) Moreover, no evidence indicates that Jackson's condition was so serious that he was unable to consent to treatment.

To the contrary, Jackson concedes that he was argumentative with Nurse Edge, and Jackson submits no evidence indicating that he followed Edge's directive to come out of his cell so that she could assess his condition. Rather, he claims that defendant Esser would not let him leave his cell. Even assuming that Esser was acting as some kind of a go-between

8

between Jackson and Edge, no evidence suggests that *Edge* stopped him from leaving his cell. Moreover, no evidence suggests that Edge was refusing to treat Jackson's dehydration. Again, to the contrary, Jackson testified in his deposition that Edge was present and available to treat him. Thus, even assuming that Esser stood in the way of Jackson receiving treatment from Edge, it was Esser who arguably acted improperly, not Edge. All Jackson's version of events suggests is that Edge was attempting to sus out whether Jackson's chest pain complaint was serious by examining him. Her attempts to take that step, but then to decline to push Jackson to be assessed once he cursed at her and refused to follow her request that he exit his cell, is not enough for a reasonable jury to find deliberate indifference on Nurse Edge's part. This is so even if accepting Jackson's assertion that she knew Jackson was gone multiple days without water and was dehydrated; Edge tried to treat assess him on May 27, and there is no dispute that Jackson had access to water that day. Furthermore, no evidence indicates that Edge prevented Jackson from pursuing further treatment after their interaction; Jackson's own behavior, not Edge's, prevented him from obtaining medical attention for his dehydration.

Jackson's alternative argument is completely devoid of support in the record. Jackson claims that after this interaction, Nurse Edge thwarted him from obtaining needed medical attention by (1) intercepting his requests for medical attention and (2) falsely stating that Jackson was refusing medical attention. Jackson speculated as much during his deposition, but he provided no actual evidence to support these serious accusations. In fact, the <u>only</u> real evidence regarding Edge's handling of Jackson's requests for medical attention after their interaction at his cell is that Edge responded to his later HSRs by

9

attempting to arrange for Jackson to be seen and assessed. There is no evidence that Edge or any other HSU staff mishandled these HSRs in a manner that prevented Jackson from obtaining medical attention for dehydration or related symptoms. In short, there is no genuine dispute as to whether Edge consciously disregarded Jackson's need for medical attention on or after May 27. Therefore, Edge is entitled to summary judgment.

## II. Captain Flannery

Defendant Flannery is entitled to summary judgment as well. Flannery argues that in his capacity as a Captain, his interaction with Jackson early on May 28, 2013, would not support a jury's finding of a conscious disregard for his need for medical attention. Nevertheless, Jackson contends in opposition that Flannery purposefully downplayed his symptoms to the on-call nurse by omitting the critical facts that he was experiencing chest pains and had gone five days without water.

Although the precise details of what Flannery reported to the nurse are not in the record, the on-call nurse later reported that Flannery told her that Jackson was complaining of dehydration. She also noted that Flannery reported that Jackson said his mouth and tongue felt dry and swollen, and that Flannery told her that his records showed he had been eating and drinking.

Further, Jackson does not dispute that his records showed he had been eating and drinking earlier that day, so Flannery cannot be faulted for reporting to the nurse that Jackson had been eating. And although Jackson now insists that he had *not* been eating or drinking, no evidence suggests that Flannery had any reason to doubt the information in

Jackson's records. As a result, no reasonable jury could fault Flannery for subsequently reporting to the nurse the content of Jackson's records.

Finally, although Jackson further maintains that Flannery intentionally downplayed his condition and reported his dehydration symptoms, even though his "organs were likely shutting down" (*see* Pl. Opp'n Br. (dkt. #123) 18), Jackson has not submitted evidence supporting that objective finding, much less supporting a finding that he brought such a serious matter to Captain Flannery's attention. In fact, Jackson does not detail how he presented to Flannery when they interacted on May 27, such that Flannery should have known that his reported chest pains were Jackson's primary concern, as opposed to his dehydration symptoms, or that he needed medical attention for his chest pains that night. And nothing in the record corroborates Jackson's assertion about the severity of his condition more generally.

While the record supports a finding that Jackson did immediately seek out medical attention the next morning, by the time WSPF staff again tried to assess him on May 31st, Jackson once again refused a nurse's attempt to take his blood and urine to evaluate whether he was suffering any lingering issues associated with the five-day lack of water. Without some evidence that Flannery knew Jackson's chest pains needed to be reported to the on-call nurse, no reasonable jury could find that Flannery's failure to provide more details to the nurse demonstrated a conscious disregard of a serious medical condition. At worst, Flannery's omission suggests that he negligently omitted his reported chest pain, not an intentional refusal to provide Jackson the care he needed for dehydration. *See Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) ("the infliction of suffering on prisoners can

be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in nature in the criminal sense"). Therefore, Flannery is also entitled to summary judgment.

As a result, this case will proceed to trial on Jackson's Eighth Amendment claim against defendant Esser only.

## ORDER

IT IS ORDERED that:

1. Defendants' motion for partial summary judgment (dkt. #111) is GRANTED.

2. Defendants Flannery and Edge are DISMISSED from this case.

Entered this 9th day of December, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge